**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JANE MOLDOVAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:18-CV-355 CAS |
| | ) | |
| WELLS FARGO COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM AND ORDER</u>

This matter is before the Court on cross-motions for summary judgment filed by plaintiff Jane Moldovan and defendants Wells Fargo & Company[1] ("Wells Fargo") and Wells Fargo & Company Short Term Disability Plan Life Insurance Company (the "Plan"), collectively referred to as "defendants." Plaintiff filed this action challenging the denial of short-term disability benefits under her employer Wells Fargo's welfare benefit plan. The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, <u>et</u> <u>seq.</u> The motions are fully briefed and ready for decision. For the following reasons, the Court will grant defendants' motion for summary judgment and deny plaintiff's motion for summary judgment.

### I. Summary Judgment Standard

The Eighth Circuit Court of Appeals has explained the applicable standards relating to summary judgment as follows:

> Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. The movant bears the initial responsibility of informing the district court of the basis for its motion, and

---

[1] Plaintiff sued this defendant as "Wells Fargo Company," but defendant states that its correct name is Wells Fargo & Company. The Court will use the latter in this opinion.

> must identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (internal citations and quotation marks omitted).

Where parties file cross-motions for summary judgment, as here, each summary judgment motion must be evaluated independently to determine whether a genuine dispute of material fact exists and whether the movant is entitled to judgment as a matter of law. See, e.g., Wermager v. Cormorant Twp. Bd., 716 F.2d 1211, 1214 (8th Cir. 1983). The denial of one motion does not necessitate the grant of the other. M. Snower & Co. v. United States, 140 F.2d 367, 369 (7th Cir. 1944).

## II. Facts

Plaintiff was employed by Wells Fargo beginning November 11, 2008 as a project manager. Wells Fargo describes plaintiff's job responsibilities as follows:

> Responsible for leading project teams and managing activities associated with projects that are typically longer-term, multiple-department or organizational entity-wide and moderate in risk, scope and complexity. Consults with business partners to clarify and define project requirements and business case, including development of a statement of work. Develops and revises complex project plans and budgets, works with users to understand complex problems and focuses on bringing issues to resolution, escalating as necessary to meet timelines. Interacts and negotiates with mid to senior level management on behalf of project team. Develops and implements complex project communication plans. Creates and delivers presentations to mid-senior level management on project goals and plans, including

2

> progress reports. May be responsible for sourcing, negotiating and managing outside vendors. May manage a group of projects associated with a specific business function. May directly manage project staff, including selection, training and conducting performance evaluations.

Doc. 17-2, Wells Fargo-Moldovan 602. Plaintiff's position requires face-to-face, telephonic, and e-mail contact with customers, working overtime, and meeting productivity quotas. Id. 603. Plaintiff's position requires frequent sitting, and seldom requires lifting, carrying, or other dynamic movements.

Plaintiff is a participant in Wells Fargo's Short Term Disability Plan ("STD Plan"), a welfare benefit plan under the Employee Retirement Income Security Act of 1974 ("ERISA"). Wells Fargo is the plan administrator and sponsor for the STD Plan, funds the STD Plan, and is ultimately responsible for paying benefits. Liberty Life Assurance Company of Boston ("Liberty") is the Claims Administrator for the STD Plan. The STD Plan provides that "Liberty has full discretionary authority to administer and interpret the STD Plan." Wells Fargo-Moldovan 56.

To be considered disabled under the STD Plan, a participant "must have a medically certified health condition that lasts longer than the [seven-day] STD waiting period and prevents you from performing the essential duties of your job." Id. 60. The STD Plan defines a "medically certified health condition" as follows:

> For purposes of the STD Plan, a medically certified health condition is generally defined as a disabling injury or illness that:
>
> • Is documented by clinical evidence as provided and certified by an approved care provider. Clinical evidence may include medical records, medical test results, physical therapy notes, mental health records, and prescription records.
>
> • Prevents you from performing the essential functions of your own job as regularly scheduled for longer than the STD waiting period.

Id. 60.

Plaintiff filed a claim for STD benefits in early June 2017, which stated that her last day of work would be June 30, 2017. Plaintiff's claim was denied as premature on June 8, 2017, and plaintiff was advised to file her claim closer to her last day of work. Plaintiff re-applied for short-term disability benefits later in June 2017, with a disability date of July 1, 2017.[2] Plaintiff's last day of work was on June 30, 2017.

In support of her STD benefits application, plaintiff submitted medical records from her primary care physician, Dr. Michael Schoenwalder, which consisted of notes from a May 30, 2017 office visit. Dr. Schoenwalder's notes list the following "problems" for plaintiff:

    E03.8  Other specified hypothyroidism
    E06.3  Autoimmune thyroiditis
    N95.1  Menopausal and female climacteric states
    G47.00  Insomnia, unspecified
    R53.82  Chronic fatigue, unspecified
    F34.8  Other persistent mood [affective] disorders

Wells Fargo-Moldovan 549. Dr. Schoenwalder's notes show a "Problem List" including "Chronic fatigue, unspecified," "Other chronic pain," and "Insomnia, unspecified." Id. 549-50. Under the general heading of "Exam," the Mental Status Exam entry was left blank. Id. 551.

Dr. Schoenwalder's notes include an "Assessment" that lists:

    R53.82  Chronic fatigue, unspecific
    F34.8  Other persistent mood [affective] disorders
    N95.1  Menopausal and female climacteric states
    G47.00  Insomnia, unspecified
    E03.8  Other specified hypothyroidism
    E06.3  Autoimmune thyroiditis

Id. 551.

---

[2]There are immaterial factual disputes about the date on which plaintiff's initial application for STD benefits was filed, and the date on which plaintiff reapplied for STD benefits.

Dr. Schoenwalder's notes state that plaintiff was compliant with medications and "has hypothyroidism. Thyroid disease related review: Complains of fatigue, heat/cold intolerance, bowel/skin changes, uncontrolled on meds." and that Plaintiff "still [had] chr[onic] fatigue." Id. 549.

Under the heading "Behavioral visit/mtgfr," Dr. Schoenwalder's notes state that plaintiff

> presents with Pt co anxiety / panic attacks, Feels down, sad, blue, crying spells or feels like crying for no apparent reason, trouble with focus. concentration, finishing a task, irritable, mood swings, edgy, tense all the time, cannot fall asleep, then keeps waking up with difficulty returning to sleep, early morning awakening, tired upon rising, tired, lethargic, apathetic. Symptoms have Stable. over last few months, on methy[l] b12 and methy[l] folate.

Id.

Dr. Schoenwalder's notes state: "[W]ent into depth on root cause of her [symptoms] related to chronic life long stress [and] her current work environment is a culprit as well." Id. 551. The notes state that plaintiff was looking into ending her job and claiming disability; "spent majority of time in cou[ns]eling on this chr[onic] issues [from] e[mo]tional trauma." Id.

On June 6, 2017, "Denise T" added the following note, signed by Dr. Schoenwalder the same date, which states:

> I recommend that Jane takes leave from work with an approximate start date 7/1/17 and will re-evaluate in September's follow up appointment (9/1/17), with an estimated possible return to work date of 10/1/17 pending re-evaluation. Due to increased stress and emotional trauma from work it is impacting her physical health. She needs to avoid stressful environments such as her workplace. Jane would benefit from short term disability at this time. She has tried treatments such as massage therapy, counseling, physical therapy, and chiropractic treatments, with little to no improvement. At this time, the best treatment for her is to rest and take leave from work.

Id. 552.

On August 8, 2017, Liberty sent a letter ("Initial Denial Letter") to plaintiff stating it reviewed her STD benefit claim and determined that benefits were not payable, quoting the STD

Plan's definition of medically certified health condition.  Wells-Moldovan 545.  The Initial Denial

Letter stated that plaintiff submitted a "claim for mood disorder and chronic fatigue" and the claim

file contained as medical documentation Dr. Schoenwalder's notes from the May 30, 2017 office

visit.  The Initial Denial Letter stated that a nurse case manager at Liberty reviewed the medical

records and found:

> You saw Dr. Schoenwalder on 5/30/17 reporting fatigue, hot/cold intolerance, anxiety, panic attacks, feeling down, sad and blue, crying spells or feeling like crying, trouble with focus and concentration, irritable, mood swings, edgy, tense all the time, sleep disturbances, lethargic, apathetic, and trouble finishing a task.  You reported symptoms are stable.  Exam was normal.  Diagnoses given are chronic fatigue, persistent mood (affective) disorders, insomnia, hypothyroidism, and autoimmune thyroiditis.  Dr. Schoenwalder discussed with you the need to work on improving health and root causes of her symptoms to include current work environment and chronic life stress.  You were looking into job ending and possible disability.  There is a note from Dr. Schoenwalder dated 6/6/17 recommending you take a leave from work starting 7/1/17-10/1/17 due to increased stress and emotional trauma from work impacting her health.  You needed to avoid stressful environments such as workplace. Restrictions and limitations are not supported as of 7/1/17, as file has no evidence of a mental status exam, abnormal lab work or abnormal physical exam.

Id. 546.

The Initial Denial Letter stated, "Based on the medical documentation received in relation

to the requirements of your job, you do not meet the definition of disability outlined above.  Thus

no benefits are payable and we must deny your claim."  Id.  The Initial Denial Letter informed

plaintiff of her right to request a review and stated, "In your request for review please include the

following documentation:"

> Hospital records, discharge summaries, exam findings, operative reports, office visit notes, psychiatry notes, therapy records, mental status exams, diagnostic test results, referrals, consultations, restrictions, limitations, treatment plans, and any other medical information from Dr. Schoenwalder and/or all treating providers from July 1, 2017 through the present.

Id. 546 (also stating plaintiff should "provide any additional information that you feel will support your claim.").

Plaintiff appealed the denial of her claim for STD benefits on August 8, 2017. In support of her appeal, plaintiff provided additional medical information to Liberty on September 5, 2017, including a letter dated September 1, 2017 from Dr. Schoenwalder; office treatment notes dated January 1, 2016 through August 7, 2017 from Dr. Schoenwalder; office treatment notes dated June 30, 2016 through July 12, 2017 from Women's Health Specialists of Saint Louis; a letter dated August 30, 2017 from Dr. Todd T. Frisch, chiropractor, and Dr. Frisch's office treatment notes from November 29, 2001 to August 23, 2017; an Adrenal Stress Index report dated December 16, 2002; and physical therapy notes dated August 15, 2015 through June 2, 2017 from Washington University Physicians–Physical Therapy Clinics. Wells Fargo-Moldovan 282.

Plaintiff's medical records from her primary care physician, Dr. Michael Schoenwalder, include notes from an August 7, 2017 office visit. The doctor's notes list the following "problems" for plaintiff:

E06.3  Autoimmune thyroiditis
E03.8  Other specified hypothyroidism
R53.82  Chronic fatigue, unspecified
F34.8  Other persistent mood [affective] disorders
N95.1  Menopausal and female climacteric states
G89.29  Other chronic pain

Wells Fargo-Moldovan 313. Dr. Schoenwalder's notes state that plaintiff "presented with has hypothyroidism. Thyroid disease related review: Complains of, fatigue, heat/cold intolerance, bowel/skin changes, CVS symptoms. pt has chronic fatigue and hashi[motos hypothyroiditis] wh[ich] is made worse by emotional stressors and thes[e] include stress r [sic] at work with chronic daily stress at work from phones, confrontations, etc. with no time for downtime or break." Id.

Under the heading "Behavioral visit," Dr. Schoenwalder's notes state that plaintiff

presents with Pt co anxiety / panic attacks, Feels down, sad, blue, crying spells or feels like crying for no apparent reason, trouble with focus, concentration, finishing a task, irritable, mood swings, edgy, tense all the time, cannot fall asleep, then keeps waking up with difficulty returning to sleep, early morning awakening, tired upon rising, tired, lethargic, apathetic. Symptoms have Stable. over last few months. pt has chronic stress and adrenal issues related to stress. The eomtional [sic] stress plays a role with her ability to function at work with acute panic attacks and triggers her flare of hashimotos. Also due to prolonged sitting this can cause extreme spasm of muscles.

Id.

Dr. Schoenwalder's notes also include the following "Problem List":

E03.8  Other specified hypothyroidism
E06.3  Autoimmune thyroiditis
R53.82  Chronic fatigue, unspecific
F34.8  Other persistent mood [affective] disorders
L70.9  Acne, unspecified
N95.1  Menopausal and female climacteric states
G89.29  Other chronic pain
G47.00  Insomnia, unspecified

Id. 314.

Under the heading "Review of Systems," plaintiff was symptomatic in the following categories:  "General: malaise, fatigue"; "Genitourinary: pst MP sxs on meds from GYN"; "Psychiatric: depression, anxiety"; and "Endocrine: cold intolerance, hypothyroidism." Id. Plaintiff was asymptomatic in the remaining categories:  Ear/Nose/Throat, Cardiovascular, Respiratory, Musculoskeletal, Gastrointestinal, Skin, Heme/Lymphatic, and Allergic/Immunologic.  Id.

Under "Exam" heading, Dr. Schoenwalder noted no abnormalities in plaintiff's skin, nose, mouth/pharynx, neck, cardiovascular, respiratory, gastrointestinal, lymphatic, musculoskeletal, skin, neurologic, reflexes, sensation, and extremities. Id. 314-15. Dr. Schoenwalder noted the following:  "General - acute distress"; "Mental Status Exa[m] - depressed and very emotional."  Id. 315.

Dr. Schoenwalder's notes of August 7, 2017 include an "Assessment" that states:

R53.82   Chronic fatigue, unspecified all related to chronic hashi[motos], chronic anxiety/adrenal stress (related to work stress and toxic environment) and chronic pain.  lx will be extended time off work to recover her body both physically and mentally
F34.8  Other persistent mood [affective] disorders this is extreme currently and has many acute panic issues and anxiety from enviornmanetal [sic] stressors from work wh[ich] is toxic at times.  she will cont[inue] xanax and strongly recommend pt will benefit from long term diasability [sic] of a[t] least 1-2 years to recover
N95.1  Menopausal and female climacteric states - on biohrt from GYn
G89.29  Other chronic pain due to emotional issues and hashi[motos]
E03.8  Other specified hypothyroidism - will cont NT and cont to work on stress mng and rest and recvory [sic]
E06.3  Autoimmune thyroiditis currently has increased stress at work wh[ich] is flaring her hashi[motos] [symptoms] of fatigue and pain and inflammation

Id. 315.

Under the heading "Plan" Dr. Schoenwalder's notes state: "seen and examined see above basically based on above medical conditions - these are extreme [symptoms] and due to the severity of [symptoms] pt will need to be off work for prolonged period o[f] time (1-2 yrs) to fully recover from all the above.  If she is to continue in this work environment it will be very unlikley [sic] that she will recover".  Id.

Prior to the May 30, 2017 office visit, plaintiff saw Dr. Schoenwalder's nurse practitioner Heather Vogel, RN.  Nurse Practitioner Vogel's mental status exam notes from plaintiff's office visits on December 2, 2016, and May 20, 2016 state:  "No signs of depression, anxiety, or agitation."

Id. 324, 329.  However, her notes from both of these visits also state:

Pt. denies anxiety / panic attacks, Feels down, sad, blue, crying spells or feels like crying for no apparent reason, trouble with focus, concentration, finishing a task, irritable, mood swings, edgy, tense all the time, cannot fall asleep, then keeps waking up with difficulty returning to sleep, early morning awakening, tired upon rising, tired, lethargic, apathetic.  Symptoms have Stable. over last few months.

Id. 322, 328.

The "Problems" observed by Nurse Practitioner Vogel at plaintiff's office visits on January 15, 2016, February 17, 2016, May 20, 2016 and December 2, 2016 are consistent with those observed by Dr. Schoenwalder at the May 2017 and August 2017 office visits:

> G47.00  Insomnia, unspecified
> R53.82  Chronic fatigue, unspecified
> F34.8  Other persistent mood [affective] disorders
> L70.9  Acne, unspecified[3]
> N95.1  Menopausal and female climacteric states
> G89.29  Other chronic pain

Id. 322, 327, 331, 336. Nurse Practitioner Vogel's notes from the May 20, 2016 and December 2, 2016 office visits state that plaintiff has hypothyroidism and chronic fatigue. Id. Under "Plan," the May 20, 2016 notes state in part, "Pt thinking about moving to [M]exico long term." Id. 329.

Nurse Practitioner Vogel saw plaintiff on February 17, 2016 for a lab review. The office visit notes states her diagnoses were:

> other fatigue (R53.83)
> hyperlipidemia, unspecified (E78.5)
> hypothyroidism, unspecified (E03.9)
> vitamin d deficiency, unspecified (E55.9)
> METHYLenetetrahydrofolate reductase deficiency (E72.12)

Id. 334.

Plaintiff was first seen in Dr. Schoenwalder's office by Nurse Practitioner Vogel on January 15, 2016. The office visit notes state that plaintiff complained of "persistent fatigue, anxiety, insomnia and chronic low back pain x 15 years." Id. 336. Plaintiff was taking Xanax at the time, id., and the treatment plan for the visit included "Will continue xanax pm for anxiety" as well as "labs to eval[uate] for metabolic deficiencies, mthfr, and hormones." Id. 339. Plaintiff denied depression, memory loss, mental disturbance, suicidal ideation, hallucinations, or paranoia, but

---

[3]Acne was not listed as a problem at the December 2, 2016 visit.

complained of chronic anxiety.  Id. 336.  Mental Status Exam notes stated in part, "No signs of depression or agitation + anxious, tearful at times."  Id. 339.

On June 12, 2017, plaintiff visited D. Woodroffe, OB/GYN nurse practitioner, whose notes include the following entries:

> She is frustrated as she feels that her symptoms are becoming more severe and she is overwhelmed.  She is very fatigued and she suffers from anxiety.  She states that stress at work is very high and she works in a somewhat hostile environment which is contributing to her stress, symptoms and overwhelm.  She feels that she is getting sicker despite all of the treatments she is following.  She is planning to start medical leave on [J]uly 1st and is hoping to be out at least 1 year.  She states that along with fatigue and anxiety she is getting muscle spasms after working at her computer all day, she has reflux related to anxiety and overall just doesn't feel well most of the time.
> . . . .
> Patient reports fatigue but reports no fever.  She reports **irritability, tension/anxiety, and depressed mood** but reports no menstrual problems.  She reports **impaired memory and impaired concentration**.  She reports **muscle aches, arthralgias /joint pain, and back pain** but reports no muscle weakness.

Id. 345 (emphasis original).

In a letter dated September 29, 2017 ("Appeal Denial"), Liberty denied plaintiff's appeal and maintained its original decision to deny STD benefits to plaintiff.  Id. 281-285.  The Appeal Denial summarized plaintiff's medical information as follows:

> In summary, you have treated with Dr. Frisch, chiropractor, since 2001 for chronic pain to your back, head, shoulder, finger, arms and legs, along with numbness to the left thigh.  You have also endorsed anxiety, depression, exhaustion, fatigue and abdominal spasms.  As of the June 27, 2017 visit you reported feeling good in some ways but that your fatigue was still too great.  You reported having sold your house but that the sale subsequently fell through and reported increased stress as of the July 12, 2017 visit.  On August 2, 2017, you reported left ankle pain after walking in St. Charles and that you were moving things back to the house.  You also reported intense stress which seemed to increase your pain and that you were planning a month long trip to Mexico.  You were last seen on August 23, 2017 during which you reported breakouts on you[r] face after stopping your thyroid medication for lab work and ongoing fatigue and pain.

For the chronic pain and fatigue complaints, you attended 25 physical therapy sessions between August 5, 2015 and June 2, 2017. Per the therapy records, you reported work stress at the March 17, 2017 visit and explained that you were being switched to a new work group with a new manager and would have more work responsibility. As of the June 2, 2017 visit there was mention that you had discussed a plan with your doctor that would include going out of work to allow your body to heal and that you were aiming to being this July 1, 2017. The therapist indicated that you were discharged from physical therapy due to a lack of progress, however it was noted that you had been progressing.

Records from H. Vogel, NP, and Dr. Schoenwalder outlined chronic symptoms and conditions since 2016 including chronic fatigue, mood disorder, insomnia, menopause, chronic pain, stress and anxiety, impaired thyroid function / [hashimotos] thyroiditis and a genetic mutation. You presented to your primary care provider on May 30, 2017 with anxiety, panic and feeling down with fatigue, intolerance to heat/cold, bowel and skin changes. The symptoms were described as stable and work stress was also mentioned. Medications at that time included the same dose of thyroid and anxiety medications as noted in December 2016 along with hormone cream and various supplements. On exam, you were described as not being in any distress with stable weight and vital signs; the remainder of the exam was unremarkable and no mental status exam was documented. The assessment was chronic fatigue, mood disorder, menopause, insomnia, hypothyroidism, autoimmune {hashimotos} thyroiditis, chronic stress and issues with work environment. Lifestyle modifications were discussed and you advised that you were seriously looking into your job ending and disability. An addendum note was added on June 6, 2017 in which it was advised that you stop work as of July 1, 2017 and remain out through October 1, 2017 due to increased stress and emotional trauma from work.

You followed up with your primary care provider on August 7, 2017 for chronic complaints including work stress. Additional symptoms included trouble with focus, concentrating, completing tasks, mood swings and apathy, but again it was noted that these were stable. On exam, you were described as in distress, emotional and depressed, but the rest of the findings were normal. Despite your cognitive complaints, there was no mini-mental status test documented. The assessment was chronic fatigue, mood disorder with panic and anxiety from a toxic work environment, menopause for which you were on hormone therapy, chronic pain and thyroid issues. The treatment included out of work for 1-2 years and continuation of medications without change.

Regarding the menopause, you followed with D. Woodroffe, NP, Ob/Gyn, since June 30, 2016. As of the June 12, 2017 visit you endorsed high stress at work with a hostile work environment and that you were planning on starting a medical leave on July 1, 2017 with hopes to be out for at least a year. You were described as being alert and active with an anxious mood and affect; the rest of the findings were normal. Due to low testosterone, for which you had been using topical treatment

since July 2016, it was indicated that you would be a good candidate for hormone pellet placement. You followed up on July 12, 2017 for injection of the pellet and again you discussed your plan to go out of work  On exam, you were described as being healthy-appearing, active, alert, oriented and anxious. A follow up in six weeks for hormone level check was indicated.

Wells Fargo-Moldovan 282-83.

The Appeal Denial stated the following conclusion:

We conducted a thorough and independent review of your entire claim. While we acknowledge that you may have symptoms associated with your conditions, the medical records on file do not substantiate the presence of a disabling condition that would warrant sustained occupational restrictions and limitations as of July 1, 2017. The fatigue, insomnia, widespread joint/muscle pains, mood disorder, thyroid disorder, anxiety and reported cognitive difficulties are chronic and pre-date your date of disability. You reported planning on going out of work along with work stressors and a toxic work environment. However, there was no evidence of any global impairment of function as you had been in the process of trying to sell your house and discussed plans to travel to Mexico for a month. Since going out of work, treatment was actually reduced as you were discharged from physical therapy and no medication adjustments for the thyroid hormone or anxiety were made. Nor were there any referrals for any formal cognitive testing, mental health providers or other specialists made. In totality, the medical evidence contained in your file is not suggestive of a condition or treatment severity that would support the need for restrictions or limitations from either a physical or mental health perspective.

The ability to perform the essential functions of your job is dependent on the impairments, if any, that are supported by the medical evidence, not an individual's own assessment of functional capacity. Therefore, in the absence of sufficient clinical evidence to support your inability to perform the activities consistent with those required to perform your job, you do not meet the definition of disability and we have determined that the denial of Short Term Disability benefits was appropriate and is supported by the medical information contained in your claim file.

Id. 283-84.

Plaintiff filed the instant action on March 5, 2018.

**III.  Discussion**

A.  ERISA Standard of Review

Under ERISA, the standard of review of a denial of benefits claim turns on whether the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  Where the plan administrator has such discretionary authority, judicial review is limited to an abuse of discretion standard.  Id.; Silva v. Metropolitan Life Ins. Co., 762 F.3d 711, 717 (8th Cir. 2014).

Here, the STD Plan provides, "Liberty has full discretionary authority to administer and interpret the STD Plan."  Based on this language, it is undisputed that Liberty had discretionary authority with respect to its decision to deny plaintiff's claim for benefits and with respect to its handling of plaintiff's appeal.  As a result, the Court applies an abuse of discretion standard, under which courts

> "must uphold [a plan administrator's] decision so long as it is based on a reasonable interpretation of the Plan and is supported by substantial evidence."  Hampton v. Reliance Standard Life Ins. Co., 769 F.3d 597, 600 (8th Cir. 2014).  A decision is reasonable "if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision."  Midgett v. Wash. Grp. Int'l Long Term Disability Plan, 561 F.3d 887, 897 (8th Cir. 2009) (quotation omitted).

Ingram v. Terminal Railroad Ass'n of St. Louis Pension Plan for Nonschedule Employees, 812 F.3d 628, 634 (8th Cir. 2016).

Review is of the plan administrator's final claims decision, not the initial denial letter.  Id. "Where a plan fiduciary offered a reasonable interpretation of a disputed plan provision, 'courts may not replace it with an interpretation of their own—and therefore cannot disturb as an 'abuse of discretion' the challenged benefits determination."  Id. (quoting King v. Hartford Life & Accident

Ins. Co., 414 F.3d 994, 999 (8th Cir. 2005) (en banc) (quotation and alteration omitted)).  "Any reasonable decision will stand, even if the court would interpret the language differently as an original matter."  Manning v. American Republic Ins. Co., 604 F.3d 1030, 1038 (8th Cir. 2010) (cited cases omitted).

B.  The Parties' Motions for Summary Judgment

In support of her motion for summary judgment, and in opposition to defendants' motion, plaintiff argues she is entitled to summary judgment because Liberty abused its discretion in determining that the medical records she submitted do not establish she had a "medically certified health condition" under the STD Plan.

Plaintiff summarizes the medical records and argues Liberty abused its discretion because the reasons stated in the Appeal Denial for its determination are either factually incorrect or are not based on the Plan's requirements.  Specifically, plaintiff asserts the following:  (1) While Liberty contends many of plaintiff's conditions were preexisting and chronic, the medical records show her conditions were getting worse prior to her application for STD benefits, in particular her mental state of being depressed and very emotional; (2) Liberty relied on its finding there was "no evidence of global impairment of function" because plaintiff had been in the process of trying to sell her house and had discussed plans to travel to Mexico for a month, but a "medically certified health condition" under the STD Plan does not require a global impairment of function, and whether plaintiff could travel to Mexico for a month or sell her house had nothing to do with whether she could perform the essential functions of her job;  (3) Liberty relied on its finding that plaintiff's treatment was reduced after she stopped work, but any improvement in plaintiff's condition after she stopped work proves plaintiff's primary care physician was correct in determining that work was contributing to her symptoms; (4) Liberty relied on the fact plaintiff was not referred for formal cognitive testing or to

15

a specialist, but nothing in the Plan requires referral for testing or specialists; and (5) Liberty stated that a finding of disability cannot rest on "an individual's own assessment of functional capacity," but plaintiff provided multiple documents from three health care providers stating she had health conditions that kept her from performing her job, and that her job was making those conditions worse, while Liberty relied on a nurse case manager "cherry-picking" plaintiff's records for statements it believed supported the denial.

Plaintiff also argues that Liberty abused its discretion in denying her claim because it has no evidence that actually contradicts the statements by her treating providers, never obtained a vocational evaluation, and instead had her claim evaluated by a nurse case manager who never examined plaintiff, citing Torres v. UNUM Life Insurance Co. of America, 405 F.3d 670, 678 (8th Cir. 2005). Plaintiff also asserts that Liberty did not reference her job description or explain a basis for disagreement with her providers' findings.

In response, and in support of their own motion for summary judgment, defendants emphasize the abuse of discretion standard, which they assert requires a plan administrator's decision to be upheld as long as it is based on a reasonable interpretation of the plan and is supported by substantial evidence, Ingram, 812 F.3d at 634. Defendants also observe that in this context, substantial evidence means "more than a scintilla but less than a preponderance." Silva, 762 F.3d at 717 (quoted case omitted).

Defendants assert that Liberty properly exercised its discretion to determine that plaintiff was ineligible for STD benefits because she did not meet the definition of "disability" under the Plan. To be disabled under the Plan, plaintiff was required to have a "medically certified health condition" that prevented her from performing the essential duties of her job. This required her to have a disabling injury or illness that was both: (1) documented by clinical evidence provided and certified

by an approved care provider; and (2) prevented her from performing the essential functions of her job as regularly scheduled for longer than the STD waiting period.

Defendants assert that Liberty properly exercised its discretion to determine that plaintiff was ineligible for STD benefits, as it reviewed all of the medical records plaintiff submitted and then reasonably concluded plaintiff did not possess a disabling injury or illness, documented by clinical evidence, which prevented her from performing the essential function of her job. Defendants assert the Appeal Denial was based on substantial evidence, as the medical records did not substantiate the presence of a disabling condition that would warrant sustained occupational restrictions and limitations as of July 1, 2017; plaintiff's complaints of fatigue, insomnia, widespread joint/muscle pain, mood disorder, thyroid disorder, anxiety, and reported cognitive disabilities were chronic and predated the date of disability; there was no evidence of a global impairment of function as plaintiff had been in the process of trying to sell her house and discussed plans to travel to Mexico for a month; after going out of work, plaintiff's treatment was reduced and no medication adjustments were made for her thyroid condition or anxiety; and no referrals were made for formal cognitive testing, mental health providers, or other specialists.

Thus, defendants argue that Liberty properly determined plaintiff did not meet the STD Plan's definition of disability as there was an absence of sufficient clinical evidence to support plaintiff's inability to perform the activities consistent with those required to perform her job. Defendants argue this determination reflected a reasonable evaluation of the claim facts and STD Plan provisions, and therefore Liberty as plan administrator did not abuse its discretion when it determined plaintiff was not eligible for benefits.

Defendants respond that Liberty was not required to conduct an occupational assessment or vocational evaluation of plaintiff, as Torres does not mandate such testing in all circumstances.

Defendants state that in <u>Torres</u>, the Eighth Circuit found the plan administrator abused its discretion by failing to perform a vocational evaluation because there were at least three occasions during the review process where its own employees noted that the opinion of a vocational consultant was necessary to determine whether the plaintiff could perform his job duties, but the administrator failed to follow through. 405 F.3d at 678. Here, defendants state there was no need for a vocational evaluation, especially because plaintiff was continuing to perform her job duties and had planned her disability absence weeks before she took leave.

C. <u>Determination Regarding Plaintiff's Disability Claim</u>

The Court now turns to the ultimate issue in this case, whether Liberty abused its discretion when it denied plaintiff's claim for STD benefits. The Court finds that Liberty's decision plaintiff did not have a "medically certified health condition" under the STD Plan's definition was reasonable, based on the administrative record that was before Liberty. The decision was supported by substantial evidence as that term is defined under ERISA, i.e., "more than a scintilla but less than a preponderance," <u>Silva</u>, 762 F.3d at 717, and "a reasonable person *could* have reached a similar decision." <u>Midgett</u>, 561 F.3d at 897.

The STD Plan defines a medically certified health condition as a *disabling injury or illness* that: (1) "Is *documented by clinical evidence* as provided and certified by an approved care provider. Clinical evidence may include medical records, medical test results, physical therapy notes, mental health records, and prescription records."; and (2) "*Prevents you from performing the essential functions of your own job* as regularly scheduled for longer than the STD waiting period." (Emphases added).

Here, plaintiff's medical records showed that she suffered from multiple chronic health conditions that predated her proposed date of disability, including fatigue, insomnia, widespread

joint/muscle pains, mood disorder, thyroid disorder, anxiety, and reported cognitive difficulties. Liberty's statement that these physical and mental conditions were chronic and predated her date of disability indicate that plaintiff had been able to perform the duties of her position while suffering from the conditions.

Plaintiff's claim for STD benefits was based on alleged worsening of both her physical and mental conditions, but Liberty determined there was an "absence of sufficient clinical evidence to support [her] inability to perform the activities consistent with those required to perform" her job. This indicates Liberty was looking for objective evidence, as required by the STD Plan, explaining why plaintiff's conditions limited her ability to work.[4]  The Court finds that substantial evidence supports Liberty's determination.

The medical records plaintiff submitted showed her physical condition, complaints, and treatments were relatively stable.  As to plaintiff's mental condition and status, the medical records largely underscore plaintiff's own assessment of her symptoms and her claims of worsening mental conditions were largely self-reported.  To the extent the medical records from D. Woodroffe, OB/GYN nurse practitioner, and Dr. Todd T. Frisch, chiropractor, discussed plaintiff's mental and emotional states, they were based on plaintiff's own statements.  Plaintiff's own statements as to her condition are not "clinical" evidence.

With respect to plaintiff's primary care physician, Dr. Schoenwalder, his notes and those of his nurse practitioner from office visits between May 2016 and August 2017 consistently state that

_____

[4]As stated above in the Facts section, Liberty's Initial Denial Letter asked plaintiff to submit in support of her request for review supporting documentation such as, "Hospital records, discharge summaries, exam findings, operative reports, office visit notes, psychiatry notes, therapy records, mental status exams, diagnostic test results, referrals, consultations, restrictions, limitations, treatment plans, and any other medical information from Dr. Schoenwalder and/or all treating providers from July 1, 2017 through the present."

plaintiff presented complaints of "anxiety/panic attacks, feeling down, sad, blue, crying spells or feels like crying for no apparent reason, trouble with focus. concentration, finishing a task, irritable, mood swings, edgy, tense all the time, cannot fall asleep, then keeps waking up with difficulty returning to sleep, early morning awakening, tired upon rising, tired, lethargic, apathetic" but that the symptoms had stabilized "over [the] last few months."  Dr. Schoenwalder's office notes for plaintiff's August 7, 2017 visit included exam results that she was depressed, anxious, in "acute distress" and "Mental Status Exa[m]–depressed and very emotional," stated her chronic anxiety/adrenal stress were related to work stress and toxic environment, that her persistent mood disorders were "extreme currently" and she had "many acute panic issues and anxiety" from environmental stressors from work, and recommended that she have "extended time off work" of at least one to two years "to recover her body both physically and mentally," and continue to take Xanax.  The notes do not reflect, however, that Dr. Schoenwalder's conclusions were based on clinical evidence or formal cognitive testing, and appear instead to reflect what plaintiff told him about stress in the work place.  Dr. Schoenwalder did not increase plaintiff's dosage of Xanax or recommend that she see a mental health provider or specialist.

Plaintiff suffers from a number of physical and mental health conditions, and reasonable minds could differ, based on the record, as to how those conditions affect her ability to perform the essential functions of her position.  This Court's "duty is to determine whether [Liberty's] decision was supported by substantial evidence, not to weigh the evidence anew."  See Green v. Union Sec. Ins. Co., 646 F.3d 1042, 1053 (8th Cir. 2011).  Based on the record as a whole, the Court finds Liberty's decision to deny plaintiff's claim for STD benefits, on the basis that it was not supported by sufficient clinical evidence to establish she was unable to perform the essential duties of her position, was based on a reasonable interpretation of the Plan and is supported by substantial

evidence. See Hampton, 769 F.3d at 600. Given the administrative record before Liberty, "a reasonable person *could* have reached a similar decision." See Midgett, 561 F.3d at 897.

Having found that Liberty's decision was reasonable given the evidence before it, the Court rejects plaintiff's assertion that Liberty abused its discretion in denying her claim because it had no evidence to contradict the statements by her treating providers. Plaintiff's assertion that Liberty abused its discretion under Torres, 405 F.3d 670, because it did not obtain a vocational evaluation of her ability to perform her job is also unpersuasive. Torres does not require a plan administrator to obtain a vocational evaluation in every case, id. at 678, and it is readily distinguishable based on its facts. In Torres, the plaintiff submitted a vocational report from a certified vocational evaluator that opined his return to work as a clinical perfusionist was not feasible because of his hearing loss. Id. at 675. The plan administrator, UNUM, never conducted an in-house review of plaintiff's vocational report, and its employees noted on three occasions during the review process that UNUM could not evaluate the plaintiff's ability to perform his occupation without the opinion of a vocational consultant, but it failed to obtain such an evaluation. Id. at 678-79. Based on this failure and other significant deficiencies in UNUM's review of plaintiff's claim, the Eighth Circuit held it abused its discretion in denying plaintiff's claim for long-term disability benefits. Id. at 681-82. Here, plaintiff did not submit a vocational evaluation, Liberty was not obligated by the STD Plan's terms to obtain one, and the case law does not contain an absolute requirement for a vocational evaluation.

## IV. Conclusion

For the foregoing reasons, the Court finds that a reasonable person could have reached a similar decision based on the evidence that was before Liberty. See Midgett, 561 F.3d at 897. As a result, Liberty did not abuse its discretion in denying plaintiff's short-term disability benefits claim

on the basis that she did not have a "medically certified health condition" as that term is defined in the STD Plan. The Court will therefore grant the defendants' motion for summary judgment on plaintiff's ERISA claims, and deny plaintiff's motion for summary judgment.

Accordingly,

**IT IS HEREBY ORDERED** that defendants Wells Fargo & Company and Wells Fargo & Company Short Term Disability Plan's motion for summary judgment is **GRANTED**. [Doc. 38]

**IT IS FURTHER ORDERED** that plaintiff's motion for summary judgment is **DENIED**. [Doc. 35]

An appropriate judgment will accompany this Memorandum and Order.

**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this  6th  day of March, 2019.